# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

**BOBBY LAIRD**                                                                **PLAINTIFF**

**v.**                              **CASE NO. 2:13CV00119 BSM**

**UNITED STATES OF AMERICA**                                 **DEFENDANT**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the bench on January 11, 2016. As a preliminary matter, the United States' motion on partial findings under Federal Rule of Civil Procedure 52(c) is denied. Having listened to the testimony and reviewed the exhibits introduced into evidence, judgment is entered in favor of the United States.

This case involves a federal prisoner, Bobby Laird, who sued the United States under the Federal Tort Claims Act for delaying medical treatment. At trial, the government admitted that Laird needed an additional surgery, and stated that the Bureau of Prisons had begun taking steps to obtain this surgery for Laird. It was known at trial that Laird would be released from prison on June 8, 2016, and it was requested that this order be held in abeyance until the government confirmed that Laird would receive the surgery before being released. This order was held in abeyance so that the findings and conclusions herein would not weigh in any way on the Bureau of Prisons's decision to either provide the surgery or not provide the surgery. Sadly, Laird was released from prison on June 8, 2016, without having received the surgery.

I.  <u>FINDINGS OF FACT</u>

Bobby Laird was incarcerated in the Federal Correction-Camp in Forrest City, Arkansas, which is operated by the Federal Bureau of Prisons ("BOP"), until his release on June 8, 2016. Beginning on January 24, 2011, Laird began to complain to BOP medical care providers about left shoulder pain. BOP provided Laird with steroid injections, and Laird was instructed to follow up as needed. Laird returned to the health services clinic on April 12, 2011, and an X-ray was ordered, which showed mild degenerative changes to his left shoulder. On May 11, 2011, Laird was seen by Dr. Bret Sokoloff, an outside orthopedic, who diagnosed Laird with arthritis in his spine, a possible rotator cuff tear, mild arthritis in his left shoulder, and possibly adhesive capsulitis or frozen shoulder. Dr. Sokoloff injected a steroid into Laird's left shoulder and ordered an MRI, which was conducted on July 18, 2011.

Laird was treated by Dr. Sokoloff again on July 20, 2011, March 27, 2012, and June 27, 2013. Between his visits with Dr. Sokoloff, Laird was treated by BOP medical providers who gave him steroid injections and anti-inflammatory medication as needed. In addition to the July 18, 2011, MRI of the left shoulder, all tests ordered by doctors were approved, including a cervical MRI on November 17, 2011, which showed multi-level degenerative disc disease; an EMG on March 29, 2012; an MRI on October 23, 2013; and an arthrogram on February 27, 2014, showing what was believed to be a full rotator cuff tear.

At trial, Dr. Martin Tindel, the clinical director of the Forrest City Federal Correctional Institution, testified that there is a process to obtain any testing or treatment not offered at Forrest City. First, any test or procedure must be approved by the clinical director

at Forrest City, and then a third party scheduling company, NaphCare, is in charge of scheduling the test or procedure. Some tests and procedures, such as an MRI, need additional approval from the Regional Medical Director before being scheduled by NaphCare. NaphCare will then schedule the test or procedure with the outside specialist and report the date back to Forrest City, and then correctional services will transport the inmate on that appointed day. Importantly, officials at Forrest City are not responsible for scheduling the consultation date; that task is reserved for NaphCare.

Specifically, the delay in obtaining two tests requested by Dr. Sokoloff are at issue: an EMG and an MRI. The EMG was obtained nearly a year after being ordered, and the MRI was obtained almost fifteen months after being ordered.

First, as to the EMG, Dr. Sokoloff requested this test on February 27, 2014, after seeing Laird that day. In Laird's medical records, Dr. Sokoloff noted, "Please consider/arrange repeat EMG to rule out other source of weakness and numbness. Schedule left shoulder arthroscopy and rotator cuff repair with distal clavicle excision and acromioplasty after EMG completed and forwarded to office." This request was received by medical officials at Forrest City on April 10, 2014, and on April 16, 2014, a physician's assistant ordered the test to be conducted, noting that the test should be completed "as soon as possible." This test was approved by the acting clinical director at the time on April 17, 2014, and sent to NaphCare for scheduling on April 21, 2014. The test was initially scheduled for May 8, 2014, but on that date, the trip was cancelled by correctional services due to staffing issues. The escort staff scheduled to take Laird had to take a different inmate

due to an emergency, and no other staff was available to take Laird. Laird's EMG went back to NaphCare to be rescheduled for a different date.

On January 27, 2015, Dr. Tindel, the new clinical director at Forrest City, discussed Laird's treatment with Dr. Sokoloff and the need for more tests since Laird already had a number of tests performed. Dr. Sokoloff told Dr. Tindel that Laird's symptoms now indicated a potential neurological issue and that an EMG and MRI were needed. The EMG was obtained on February 19, 2015, and Laird underwent surgery on his left shoulder on April 2, 2015. During this surgery, Dr. Sokoloff performed a subcromial decompression of Laird's left AC joint but did not repair the left rotator cuff because the rotator cuff was not fully severed, as initially believed. Dr. Sokoloff testified that Laird received some relief from the decompression but not total relief because his pain is also caused by cervical nerve root compression.

As for the second test, Dr. Sokoloff ordered a repeat cervical MRI on April 16, 2014. A physician's assistant reviewed Dr. Sokoloff's recommendation on April 16, 2014, and ordered the MRI to be conducted. The acting clinical director approved the test on April 17, 2014, and sent the request to the regional medical director, who approved the test on May 6, 2014. The MRI was performed on August 12, 2014, and the BOP received the results on September 22, 2014. For reasons unknown, the results of this test were never sent to Dr. Sokoloff. After Dr. Tindel spoke to Dr. Sokoloff about Laird's treatment on January 27, 2015, another MRI was scheduled for February 23, 2015, but that trip was cancelled due to inclement weather. After performing the shoulder surgery on April 2, 2015, Dr. Sokoloff

4

again requested a repeat cervical MRI. Laird was seen at health services in June 2015 by Dr. Capps, who requested another MRI of the cervical spine. On July 9, 2015, the BOP sent Laird for a cervical MRI, which showed nerve root compression.

After reviewing this MRI with Laird on July 28, 2015, Dr. Sokoloff believed that Laird needed to see a neurosurgeon for a decompression fusion procedure. Dr. Tindel approved this request on July 30, 2015, and the regional medical director approved the request on October 21, 2015. Laird saw Dr. James Feild, an outside neurosurgeon on December 21, 2015, who recommended surgery. After re-examining Laird on May 16, 2016, Dr. Feild decided based on Laird's symptoms that surgery was not appropriate at that time, and Laird was released from prison on June 8, 2016, without having received the decompression fusion surgery.

## II. CONCLUSIONS OF LAW

Judgment is entered in favor of the United States because Laird has failed to prove that the BOP breached the applicable standard of care or that any failure on the BOP's part was the proximate cause of Laird's injuries. Because this case has been brought under the Federal Tort Claims Act, the law of the state where the alleged tort took place applies, which is Arkansas. 28 U.S.C. § 1346(b) (2012); *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 743 (8th Cir. 2009). In an action for medical injury under Arkansas law, the plaintiff "must prove the applicable standard of care, that the medical provider failed to act in accordance with that standard, and that such failure was a proximate cause of the plaintiff's injuries." *Webb v. Bouton*, 85 S.W.3d 885, 891 (Ark. 2002). Usually, the plaintiff is required to prove

these three elements by expert testimony, but an expert is not required in every case. Ark. Code Ann. § 16-114-206(a) (requiring an expert only "when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge"). Because the asserted negligence is a delay in treatment, it has already been determined that expert testimony is not required. *See* Doc. No. 73; *see also Lanier v. Trammell*, 180 S.W.2d 818 (Ark. 1944).

A.      Applicable Standard of Care / Breach

Because expert testimony is not required, "Arkansas law determines the standard of care required of the doctors and the Infirmary. Under that law: a physician is required to possess and exercise that degree of skill and learning possessed and exercised by members of his profession or specialty in the same or similar communities." *Jeanes v. Milner*, 428 F.2d 598, 601 (8th Cir. 1970) (citing *McClellan v. French*, 439 S.W.2d 813 (Ark. 1969)). The applicable standard of care is easy to infer in these "common sense" cases. *See Scales v. Jonak*, No. 5:05CV00223 JWC, 2006 WL 3327952 (E.D. Ark. Nov. 15, 2006) ("The distinction seems to turn on whether medical knowledge, training, or expertise is necessary when addressing the alleged medical negligence, as opposed to merely common sense."); *see also Rogers v. Sargent*, 2010 Ark. App 640U, 2010 WL 3783696 (leaving a surgical sponge inside of a patient during surgery invokes a common sense analysis); *Lanier*, 180 S.W.2d at 819 (failing to sterilize instruments and wash hands before surgery invokes a common sense analysis). As for the applicable standard of care in this case, Dr. Sokoloff stated that the standard of care for obtaining the repeat EMG and MRI testing would be "probably four

6

months or so." Sokoloff Dep. 23:14. Although the United States has consistently objected to any standard of care propounded by Dr. Sokoloff, this argument is moot, as Laird is unable to prove that the United States breached its duty to provide medical treatment to Laird in a timely manner.

The asserted negligence here, as it has been since Laird originally filed his complaint in 2013, is a delay in treatment. Even though it took the United States nearly a year to obtain the EMG test and almost fifteen months to obtain the MRI test, the United States did not breach the applicable standard of care because it did what a reasonable healthcare facility would do: it approved and ordered tests and made sure that Laird's medical issues were being addressed.

When considering a breach, the fact that a delay occurs does not automatically impose liability upon the defendant. *Cf. Rogers*, 2010 WL 3783696, at *3 ("Neither the Medical Malpractice Act nor our case law provides that the mere presence of a foreign object in a surgical patient establishes liability on the part of the surgeon as a matter of law."). In *Rogers*, a patient sued a doctor for medical malpractice after a surgical sponge was left inside the patient during a gallbladder surgery. *Id.* at *1. Because the evidence showed that it was reasonable for the doctor to rely on the nurses' sponge count to be correct, the court held that "a jury could reasonably find that, despite leaving a sponge in [the patient's] abdomen, Dr. Rogers was not negligent in doing so." *Id.* at *3. Rather, "[w]hether the particular act [is] negligent is for the jury to decide, after considering the circumstances of the case." *Id.* (first alteration in original) (quoting *Spears v. McKinnon*, 270 S.W. 524, 526 (Ark. 1925)).

7

In this case, the United States did not commit medical malpractice. There is no factual dispute that it took nearly twelve months to obtain the EMG and almost fifteen months to obtain the MRI. As explained by *Rogers*, this time period alone does not establish negligence. To effect safety and security, the BOP has a process for obtaining testing and procedures from healthcare practitioners outside the BOP. This process includes ordering the test, approval by the clinical director, further approval by the regional director in some cases, and then submission to a third party, NaphCare, for scheduling. The BOP received Dr. Sokoloff's request for additional EMG testing. The medical director approved this request and submitted the request to NaphCare to schedule a date to obtain the testing. After Laird was unable to obtain the testing on May 8, 2014, it is still unknown how or why the test was not rescheduled immediately, but there is no evidence that the BOP was negligent in failing to follow its usual process for scheduling or that the BOP was even responsible for rescheduling the operation after it was pushed back in May 2014. Here, the BOP acted as a reasonable medical care provider would: it approved a request for additional testing and passed this information on to NaphCare for scheduling, as it always did. It is not appropriate to hold the government liable for medical malpractice when it followed its usual procedure for outside medical testing.

Laird argues that the government should not be able to free itself from liability simply by passing the blame onto a third party. The Arkansas Supreme Court considered this very issue in *Spears v. McKinnon*, 270 S.W. 524 (Ark. 1925); *see also Rodgers*, 2010 WL 3783696, at *3 ("Although decided in 1925, *Spears* has never been overruled and remains

8

the law in this jurisdiction."). *Spears* was a medical malpractice case in which the doctors left a sponge or gauze in the patient's abdomen. *See Spears*, 270 S.W. at 525. The doctors argued that they were not liable because it was the attendant nurses's job to make sure that no sponges or gauze was left inside the patient. *Id.* at 526. The Arkansas Supreme Court rejected the idea that the doctors could automatically relieve themselves of liability by passing blame onto a third party but held that negligence would be determined based on the "circumstances of the case." *Id.* (citation omitted). Based on the circumstances of Laird's case, the BOP did not commit medical malpractice, not because it cast blame onto a third-party scheduler, but because it followed its procedures in obtaining a medical test for an inmate. Accordingly, the BOP is not liable based on any theory that it delayed in treating Laird.

B.     Proximate Causation

Even if an applicable standard of care had been breached, Laird has not proved by a preponderance of the evidence that the defendant's alleged negligence is the proximate cause of his injuries. "Proximate cause is that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Dodd v. Sparks Reg'l Med. Ctr.*, 204 S.W.3d 579, 585 (Ark. Ct. App. 2005). The Arkansas Medical Malpractice Act "implements the traditional tort standard of requiring proof that 'but for' the tortfeasor's negligence, the plaintiff's injury or death

would not have occurred." *Ford v. St. Paul Fire & Marine Ins. Co.*, 5 S.W.3d 460, 462-63 (Ark. 1999). "It is not required in a case of this kind that the injured party show to a mathematical certainty or to the exclusion of every other hypothesis that his injury occurred as a result of the negligence of which he complains." *Lanier*, 180 S.W.2d at 823.

Laird first complained of pain in his left shoulder in January 2011. All signs pointed to a degenerative condition that had developed as part of the natural aging process. The BOP and Dr. Sokoloff took a conservative approach to Laird's treatment, and the defendant's expert, Dr. Andrew Heinzelmann, who testified at trial by video deposition, noted that a conservative approach was an appropriate approach to take. Dr. Heinzelmann testified that he believed that the medical treatment Laird received was within the applicable standard of care and that even if surgery had been performed earlier, a better outcome would not have been guaranteed. According to Dr. Heinzelmann, Laird's symptoms can persist, even in the face of appropriate treatment. Based on the actions the BOP took, Dr. Heinzelmann testified that he did not believe there was any long-lasting effect from a delay with regard to Laird's left shoulder. Although Dr. Heinzelmann is not a cervical neurosurgeon, his testimony regarding the BOP's treatment of Laird's left shoulder injury, which was thought to be the problem from the beginning, carries great weight. Based on the reliable testimony of Dr. Heinzelmann, Laird is unable to show, by a preponderance of the evidence, that the BOP's actions were the proximate cause of his injury.

C.   Conclusion

The difficulty of this case is further compounded by the fact that the prison context is different than a non-prison context. In the free world, a patient has many more options when it comes to seeing a doctor, obtaining tests, and having operations performed. In contrast, every outside appointment for a prisoner must go up the administrative ladder, a process that takes time in order to effect safety and security. In no way does this mean that a prison is free to disregard the medical needs of an inmate or that a prison may delay treatment of a prisoner. This does mean, however, that Laird's challenge is understandable, but at the end of the day, the BOP is not liable in this case.

For the reasons set forth above, Laird is unable to prove that the BOP violated the applicable standard of care or that the BOP's actions were the proximate cause of his injuries, and judgment is entered in favor of the United States.

IT IS SO ORDERED this 27th day of July 2016.


UNITED STATES DISTRICT JUDGE